## ATCHISON, T. & S. F. R. CO. et al. v. STATE.

No. 12175—Opinion Filed Feb. 14, 1922.

Rehearing Denied March 21, 1922.

(Syllabus.)

**1. Railroads—Rates—Basis of Rate-Fixing —Reasonableness — Powers of Corporation Commission.**

In fixing a rate to be charged by a railway company, the Corporation Commission is not confined to the sole question of the reasonableness of the rate. It may be reasonable, yet if it discriminates in favor of one locality as against another, it should be corrected.

**2. Same—Power to Change Discriminatory Rates.**

The Corporation Commission is not prevented from changing a rate which is manifestly discriminatory because such order impairs the general rate scheme. If a fixed rate is so discriminatory as to be abusive, the abuse should be corrected.

**3. Same—Change of Intrastate Rates to Correspond to Interstate Rates.**

When the interstate freight rates put into effect by the Interstate Commerce Commission are materially lower for the same length of haul on the same class of commodities than the intrastate rates made under the orders of the Corporation Commission this constitutes such a discrimination that it is the duty of the Corporaton Commission to remove it by readjusting the rates.

**4. Same—Order Changing Coal Rates—Affirmance.**

On an examination of the record, held, that it fully supports the order of the Corporation Commission.

**5. Corporation Commission — Powers—Refunds for Excessive Rates.**

The Corporation Commission is hereby vested with the power of a court of record to determine: First, the amount of refund due in all cases where any public service corporation, person, or firm, as defined by the Constitution, charges an amount for any service rendered by such public service corporation, person, or firm, in excess of the lawful rate in force at the time such charge was made, or may thereafter be declared to be the legal rate which should have been applied to the service rendered; and, second, to whom the overcharge should be paid. Section 1, chap. 10, Session Laws 1913.

**6. Same.**

Where no authorized rate has been established to be charged by a public service corporation for a specific service, and such public service corporation makes an arbitrary charge therefor, and thereafter the Corporation Commission fixes a rate to be charged for such service, and by such rate so fixed it appears the arbitrary rate charged and collected by said public service corporation is excessive, the Corporation Commission, by section 1. chapter 10, supra, is vested with power to compel a refund of the excess rate so charged and collected.

**7. Same—Carriers—Right of Shipper to Refund.**

Where a shipper makes application to the Corporation Commission to fix a rate to be charged by a public service corporation for a specific service, and in such application such shipper sets out a state of facts that would entitle him to reparation under section 1, chapter 10, supra, it is the duty of the Corporation Commission to take cognizance of such facts and determine what amount of refund, if any, such shipper is entitled to.

On Rehearing.

**8. Railroads — Rate Regulation—Refunds- Constitutional and Statutory Provisions.**

Section 23, article 9. of the Constitution is not an inhibition on the Legislature denying its authority to pass section 1, chapter 10, Session Laws of 1913, authorizing the Corporation Commission to find the amount of illegal, unwarranted, and discriminatory charges made by transportation and transmission companies for the hauling of commodities and ordering a refund thereof, since section 35. article 9. of the Constitution gave the Legislature power. after the second Monday in January, 1909. to alter, amend, revise, or repeal sections from 18 to 34, inclusive, of article 9 of the Constitution.

Appeal from Order of the Corporation Commission.

Complaint before the Corporation Commission by the Dewey Portland Cement Company against the A'tchison, Topeka & Santa Fe Railway Company and others, seeking re-adjustment of certain freight rates on coal. From the Commission's orders, the railway companies appeal. Affirmed.

Cottingham, Hayes, Green & McInnis, M. D. Green, Jones, Foster & Randolph, and Kleinschmidt & Grant, for appellants.

S. P. Freeling, Atty. Gen., Raymond W. Moore, and Henshaw & Hough, for appellees.

MILLER, J. A complaint was filed with the Corporation Commission by the Dewey Portland Cement Company against the Atchison, Topeka & Santa Fe Railway Company. the Kansas, Oklahoma & Gulf Railway, the Missouri, Kansas & Texas Railway Company, and C. E. Schaff, receiver thereof, and the St. Louis-San Francisco Railway Company, asking that the Corporation Commission adjust and fix rates to be charged by the defendant railway companies on coal in car lots transported by the said railway companies from what is known as the Tulsa district and Henryetta district to the complainant's plant at Dewey, Oklahoma. A hearing was had before the Corporation Commission, after which it made its order No. 1813, which order adjusted and fixed the rates on a basis of the length of the haul. The railway companies affected by this order have joined in an appeal to this court to reverse the ruling of the Corporation Commission, and appear here as appellants.

They make five assignments of error, in which they claim that the rate is unreasonable, unjust, and not based upon sufficient evidence; is contrary to law; is confiscatory; is unjust discrimination, and that the Corporation Commission erred in entering and promulgating the order. In their brief they say:

"The assignments of error above numbered may for convenience be considered together."

A large amount of documentary evidence was introduced on the hearing, and the Corporation Commission made its findings of fact, which are very exhaustive, and, based upon these findings of fact, made its order, No. 1813, as follows:

"This case being at issue upon complaint and answers on file, and having been duly heard and submitted by the parties. and full investigation of the matters and things involved having been had, and the commission having on the date hereof made and filed a report containing its findings of facts and conclusions thereon, which said report is above referred to and made a part hereof;

"It is Ordered, That the above-named defendants, according as they participate in the transportation, be and they are hereby notified and required to cease and desist, on or before December 15th, 1920, and thereafter to abstain from publishing; demanding or collecting for the transportation of mine run and slack coal, in carloads from mines in Oklahoma group No. 3, designated as follows: Collinsville, Mohawk, Dawson, Rudd and Broken Arrow to Dewey, Oklahoma, rates which exceed $1.21 1-2 per net ton on home run or lump coal as designated in SWLT 83-C and $1.08 per net ton on coal designated as slack in SWLT 83-C, and from Henryetta group involving mines located at Henryetta and Dewar, $1.62 per net ton on mine run (lump coal) and $1.21 1-2 on coal designated as slack in SWLT 83-C.

"It is Further Ordered, That the rates above designated from the various mines in Oklahoma to Dewey, Oklahoma, shall be published on or before 15th day of December, 1920, upon notice of this commission and to the general public, by not less than 5 days, and that they shall continue in effect until the rates from the mines above described in Kansas to Dewey, Oklahoma, have been increased or changed in such a manner as to warrant further orders from this commission.

"Done at Oklahoma City, this the 24th day of November, 1920."

The appellants, complaining of said order, say that it discriminates in favor of certain shippers and localities, making a lower rate than the general uniform scale applicable in the state. They also say that this impairs the general rate scheme in Oklahoma which was worked out after great difficulty. In appellants' brief they say:

"The basis for this action, according to the complaint, the evidence and the order of the commission is briefly this: It is claimed that the complainant, Dewey Portland Cement Company, located at Dewey, Oklahoma, was in active competition with various cement mills located in the state of Kansas; that the rates on coal from the Kansas coal mines to the Kansas cement mills were formerly lower than the rates on coal from the Kansas mines to the mill at Dewey; that complaint having been made to the Interstate Commerce Commission, that commission ordered a reduction in the interstate rate between the Kansas mines and Dewey to approximately the basis of the Kansas intrastate rate; that while this reduction enabled the Dewey mill to compete with the Kansas mills in securing coal from the Kansas mines, that when the Dewey plant desired to secure coal from Oklahoma mines in

the Dawson and Henryetta districts, the rate was higher than from the Kansas mines to the Kansas mills for the transportation of coal within Kansas. Complainant therefore seeks a reduction in the Oklahoma rate to the basis of the Kansas rate. The evidence further showed that unduly low rates on coal within the state of Kansas had been fixed years ago in order to encourage the establishment of certain smelter plants; that thereafter cement plants were located in that territory and took advantage of these coal rates; that the Interstate Commerce Commission in fixing the interstate rate between Kansas and Oklahoma did not consider or pass upon the reasonableness, sufficiency or compensatory character of the rate, but made the adjustment for the sole purpose of placing the Dewey plant on a parity with the Kansas mills in securing a supply of · coal from the Kansas mines.

"The contention of the defendants is that the Dewey plant having thus been placed on a parity with the Kansas plants as to the common source of coal supply, the interstate rate cannot be used as a basis for reducing the Oklahoma intrastate rates, since the Dewey mill already enjoys an advantage over the Kansas mills with respect to coal· secured from Oklahoma mines; the rates for the transportation of coal from Oklahoma to the Kansas mills being materially higher than the rates in effect for the transportation of coal from these Oklahoma mines to the Dewey mill; and that to reduce the Oklahoma intrastate rates into Dewey simply increases this advantage of the Dewey plant over its Kansas competitors at the expense of the railroads, and also gives the Dewey plant an unjust and unreasonable preference and unjustly discriminates against all of the other cement plants, industries, shippers and localities in the state of Oklahoma, who as hereinafter pointed out are required to pay materially higher rates for the transportation of coal from Oklahoma mines than are to be paid by the Dewey plant under this order for similar distances."

The contentions of the Dewey Portland Cement Company are very concisely set forth in its opening statement before the Corporation Commission, which is as follows:

"If the commission please, the theory of the complainants in this case is one purely of discrimination. The Dewey Portland Cement Company's plant is located at Dewey, Oklahoma, and within a few miles from the Kansas line. North, in Kansas, are several coal mines located approximately the same distance and under the same traffic conditions as the mines south of Dewey, in Oklahoma. The interstate rate for the same distance is—will range from thirty-five cents to something like a dollar per ton less than the state rates now in force in Oklahoma. This same condition arose once before. The Commission of Oklahoma at that time did

not want to disturb their general coal rate scheme but did eliminate this discrimination by issuing an order providing that order should remain in effect until the interstate rates were raised. Discrimination may be removed by raising of the interstate rates or by lowering the state rates, and of course, as this commission have no jurisdiction over the interstate rates, it is unfair to permit the state rates to remain in effect creating this discrimination. When this 35 per cent. rate increase was granted by the Commission they did it, of course, without any consideration as to these discriminations on border towns and border lines that would necessarily arise, and while the Kansas Commission has only added 15 cents a ton to the coal in Kansas as I understand it, it, of course, will doubtless be contested or is being contested by the carriers who have already filed with the Interstate Commerce Commission to require 35 cents in Kansas. However, that will not relieve this situation. The Interstate Commerce Commission prescribed the rates on an order from Kansas into Oklahoma. The exhibits we have here will develop the case more clearly and as quickly as I can discuss it further."

The Corporation Commission, after hearing and considering the evidence, made the following findings of facts upon which it based its order.

### "Findings of Facts.

"The evidence shows that for several years prior to 1917, the rates on slack coal from West Mineral and Pittsburg districts to the gas-belt in Kansas, was 45c per net ton for single line haul, and that the Santa Fe and M., K. & T. separately applied a rate of 45c from mines on their lines to Dewey. That the Frisco and M., K. & T. maintained joint rates of 55c from mines on the former to points in the gas-belt served by the M., K. & T. and to Dewey, Oklahoma. That on January 11, 1917, joint rates on the Frisco and M., K. & T. to Dewey were increased to 70c, and on July 20, 1917, following the fifteen per cent. Case 45 I. C. C. 303, the rates of the Santa Fe and M., K. & T. for same distances, were increased to 60c and the joint rates of the Frisco and M., K. & T. to 85c. The rates to the Kansas gas-belt were not increased.

"That on June 25, 1918, pursuant to General Order No. 28, issued by the Director General of Railroads, the rate of 80c was established from Santa Fe and M., K. & T. to the Kansas gas-belt mills and to Dewey. This had the effect of restoring the parity of rates formerly existing from those mines. Interstate Commerce Commission's order No. 9883 had the effect of establishing rates from West Mineral and Fleming to Dewey, Oklahoma, 90c per net ton on mine run, and 80c per ton on slack coal. This rate remained in effect until August 26, 1920, which was

automatically changed to $1.21 1-2 on mine run and $1.08 on slack coal for a distance of 124 miles, while the rate from Arcadia, prior to August 26, 1920, was 90c on slack for a distance of 112 miles subject to increase of 35 per cent. after that date, the latter point being a two line haul.

"After the rates were authorized by the Interstate Commerce Commission in Investigation and Suspension Docket No. 338, 30 I. C. C. 115 complaint was filed by the Hickory Coal & Mining Company, alleging discrimination of the rates involved in this case on shipments originating at Rudd, Oklahoma, destined to Dewey and Bartlesville. Commission's Order 1015, 419 Commission's Annual Report 1915-1916, in commenting on the situation states as follows:

" 'It is the opinion of the commission that the rates on coal from Rudd to Dewey and Bartlesville, Oklahoma, are unreasonable, inasmuch as they exceed the interstate rates.'

"After this order was issued, corrections were then made in SWLT 83-A, placing Rudd on the same basis as the rates complained of. These rates remained in effect until March 25, 1918, at which time the carriers canceled commission's rates and established rates as per own volition. Later these rates were increased as per General Order No. 28 of the administration, which resulted as follows:

Lump Coal (Mine run) and Slack Coal
Rates to Dewey From Following Oklahoma Points:
Column 1 Lump Coal or Mine Run

| | | | | | |
|---|---|---|---|---|---|
| " 2 " " " " " | | | | increased 35% | |
| " 3 Slack Coal Rates | | | | | |
| " 4 " " " | | | | Increased 35% | |
| 5 Distance to Dewey. | | | | | |
| Column | 1 | 2 | 3 | 4 | 5 |
| Collinsville | .90 | 1.215 | .80 | 1.08 | 35 |
| Mohawk | 1.00 | 1.35 | .90 | 1.215 | 49 |
| Dawson | 1.10 | 1.485 | 1.00 | 1.35 | 59 |
| Rudd | 1.10 | 1.485 | 1.00 | 1.35 | 88 |
| Broken Arrow | 1.10 | 1.485 | 1.00 | 1.35 | 98 |
| Henryetta | 1.70 | 2.295 | 1.50 | 2.025 | 112 |
| Dewar | 1.70 | 2.295 | 1.50 | 2.025 | 115 |

"The first and third columns represent the rates prior to August 26, 1920, while the second and fourth columns represent the 35 per cent. increase which are the rates at the present time.

"For ready reference the following is a comparison of the rates from the Kansas mines involved, to Dewey, prior to the 35 per cent. increase and afterwards:

Mine Run and Slack Coal Rates Per Ton From Kansas Mines to Dewey, Oklahoma.
Column 1 Mine run rate
Column 2 " " " Increased 35%
Column 3 Slack coal rate
Column 4 " " " Increased 35%

| Columns | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| W. Mineral | .90 | 1.215 | .80 | 1.08 | 80 |
| Frontenac | 1.00 | 1.35 | .80 | 1.08 | 124 |
| Arcadia | 1.20 | 1.62 | .90 | 1.215 | 112 |

"It will be observed from the foregoing tables, that the distances from all Oklahoma points involved, except Henryetta and Dewar, are comparable with the distance from West Mineral, and that the distance from Henryetta and Dewar are comparable with Frontenac and Arcadia.

"In passing upon the question of the 35 per cent. increase recently granted by the Interstate Commerce Commission, in its Ex parte 74, the commission said: 'It is impracticable at this time to adjust all rates on individual commodities. The rates to be established on the basis herein approved must necessarily be subject to such readjustments as the facts may warrant. It is considered by the carriers, that readjustments will be necessary.'

"In considering the application of the various carriers for increased rates in compliance with the provisions of Ex parte 74 of the Interstate Commerce Commission, and viewing the rate structure as a whole, this commission considered that exceptions would be necessary and fortified itself with the same provisions as was contained in Ex parte 74 on page 8 of its order 1781. In passing upon the general scheme of rates, discrepancies could not be considered, but must be later taken up separately and considered on the facts presented in each case.

"In this consideration this commission is of the opinion and finds that the rates from the so-called Tulsa group to Dewey, Oklahoma, should not exceed the rates on both mine run and slack coal from the West Mineral district and that the rates from the so-called Henryetta group should not exceed the rates on mine run and slack coal from the so-called Arcadia mines. An order will be entered accordingly."

The evidence introduced clearly sustains the findings of facts made by the Corporation Commission. The rates fixed by the order for the transportation of coal and slack from some of the mines may be higher than they should have been. We have taken into consideration that the evidence shows, on short hauls, the cost of handling the cars at the terminals is from one-third to two-thirds of the total expense of transportation. On the long hauls the terminal expense is about one-third of the transportation expense. It also appears there is a grouping of the mines and the same rate fixed for all mines within a specified group. This has been done in order that there shall be no discrimination in favor or against any of the mines included in one group. This policy has been adopted under the general rate scheme. In view of all these facts and conditions, we do not feel justified in modifying the order by lowering the rate fixed by the Corporation Commission on the short hauls.

It is clear from the evidence that the rates heretofore charged by the railways for the transportation of the mine run coal and slack coal from the mines in Oklahoma are far in excess of the rates allowed the railway companies for like hauls under the Interstate Commerce Comimssion, and the interstate rates exceed the rates allowed in the state of Kansas·for similar service.

Appellants complain that the rate fixed by the Corporation Commission discriminates in favor of the Dewey Portland Cement Company. We do not think the order is subject to this criticism, for any other shippers of coal at Dewey, Bartlesville, or intermediate points would be entitled to the benefit of this order. The discrimination we find is that which existed before the order was made wherein the railways affected by this order discriminated against the coal mines in the Tulsa group and the Henryetta group. In Hines v. Wilmington & W. R. Co. 95 N. C. 434, the court in speaking of "discrimination," said:

"It is a term well understood in the nomenclature of transportation over railroads. It may have a wider significance, but for the present purpose it implies, to charge shippers of freight as compensation for carrying the same over railroads unequal sums of money for the same quantity of freight for equal distances; more for a shorter than a longer distance, more in proportion to distance for ·a shorter than a longer distance; more for freight called 'local freight' than those designated otherwise; more for the former in proportion to distance such freights may be carried than the latter."

In 10 Corpus Juris, section 777, at page 491, the rule is laid down as follows:

"In passing on the question of reasonableness of discrimination, it is proper to take into consideration, besides .the mere difference in charges, the various elements, such as the·convenience of the public, the fair interest of the carrier, the relative quantities of the traffic involved, the relative cost of the services and the profits to the company, and the situation and circumstances of the respective customers with reference to each other as competitive or otherwise. But it is not proper to take into consideration the fact that the charge is reasonable in itself, since a ·charge may be perfectly reasonable and yet create an unjust discrimination. Neither is it proper to consider the length of time during which the rates have been in force nor the confusion which will result from a change."

Appellants complain that by this order the Corporation Commission has impaired the general rate scheme in Oklahoma which was worked out after great difficulty. It may

be this order of the Corporation Commission has broken a cog out of the wheel in the general rate scheme in Oklahoma. It may be necessary to make a general readjustment of the rate scheme to eliminate the discriminations that have heretofore existed as between interstate and intrastate rates and corresponding rates of adjacent states, if such discrimination exists. The last sentence quoted from section 777 of Corpus Juris, supra, reads:

"Neither is it proper to consider the length of time during which the rates have been in force nor the confusion which will result from a change."

In East Tennessee, V. & G. Ry. Co. v. Interstate Commerce Commission, before the Circuit Court of Appeals for the Sixth Circuit, 99 Fed. 63, Judge Taft, speaking for the court, said:

"We are pressed with the argument that to reduce the rates to Chattanooga will upset the whole southern schedule of rates, and create the greatest confusion; that for a decade Chattanooga has been grouped with towns to the south and west of her, shown in the diagram; and that her rates have been the key to the southern situation. The length of time which an abuse has continued does not justify it. It was because time had not corrected abuses of discrimination that the interstate commerce act was passed. The group in which Chattanooga is placed, shown by the diagram above, puts her on an equality in respect to eastern rates with towns and cities of much less size and business, and much further removed from the region of trunk-line rates, and with much fewer natural competitive advantages. If taking Chattanooga out of this group and putting it with Nashville requires a readjustment of rates in the South, this is no ground for refusing to do justice to Chattanooga. The truth that Chattanooga is too advantageously situated with respect to her railway connections to the north and east to be made the first city of importance to bear the heavier burden of Southern rates. when Nashville her natural competitor, is given northern rates. The line of division between northern and southern rates ought not to be drawn so as to put her to the south of it, if Nashville is to be put to the north of it. And we feel convinced from a close examination of the evidence that, but for the restriction of normal ·competition by the Southern Traffic Association, her situation would win for her certainly the same rates as Nashville. It may be that the difficulty of readjusting rates on a new basis is what has delayed justice to Chattanooga. It may well be so formidable as to furnish a motive for maintaining an old abuse."

Section 30, art. 9, Constitution of Oklahoma, authorizes the Corporation Commis-

sion to do just what they have done in this proceeding. It provides in part as follows:

"The commission may, from time to time, authorize any such company to disregard the foregoing provisions of this section, by charging such rates as the commission may prescribe as just and equitable between such company and the public, to or from any junctional or competitive points or localities or where the competition of points located without this state may make necessary the prescribing of special rates for the protection of the commerce of this state."

The prima facie presumption that the rate fixed by the Corporation Commission is just, reasonable, and correct, is fully sustained by the evidence.

The Dewey Portland Cement Company complains in its petition for rehearing that it has a right to have the question of reparation passed upon. This question was presented to the Corporation Commission in the original complaint filed by the Dewey Portland Cement Company with the Corporation Commission, and upon which complaint order No. 1813 was made. In the 11th paragraph of the complaint it states that respondents failed to establish and keep in effect rates on mine run coal on mines in the Henryetta district to Dewey. That the only rates applicable are the lump coal rates. That these rates are unjust and unreasonable for the transportation of mine run coal from said points to Dewey. In the prayer of the complaint it states:

"Complainant further prays that an order be made commanding and directing the defendants herein to pay to it by way of reparation all money collected in excess of the rates found to be just and reasonable on all shipments of slack coal, transported from the Tulsa and Henryetta districts to Dewey, Okla., on and after September 1, 1920, by defendants herein, individually and jointly."

The Corporation Commission failed to take cognizance of this question presented to it. The Dewey Portland Cement Company called this question of reparation to the attention of this court in its original brief filed herein, and by its petition for rehearing insists that the court pass on this question. We think, as complainants presented this matter in their original complaint, the Corporation Commission should have taken cognizance of it and passed upon the question. Notwithstanding the failure of the Corporation Commission to pass on the questions presented in the complaint, it is the duty of this court to make such orders as will afford the complainant the relief it is entitled to.

The respondent railway companies have filed their response to the petition for rehear-

ing, in which they contend that complainant is not entitled to the relief asked for by way of reparation under chapter 10, Session Laws 1913. They contend that a rate cannot be retroactive. That they have not filed any supersedeas bond and have not been charging or collecting a rate in excess of that fixed by the C rporation Commission in its order No. 1813, from the date on which said order went into effect, which was December 15, 1920.

Section 1 of said chapter provides.

"The Corporation Commission is hereby vested with the power of a court of record to determine: First, the amount of refund due in all cases where any public service corporation, person, or firm, as defined by the Constitution, charges an amount for any service rendered by such public service corporation, person, or firm, in excess of the lawful rate in force at the time such charge was made, or may thereafter be declared to be the legal rate which should have been applied to the service rendered; and, second, to whom the overcharge should be paid."

The record in this case shows that the rate charged by the railway companies for the transportation of the mine run and slack coal was an arbitrary rate fixed by the railway companies. That no rate had been declared or promulgated. Said section 1, chapter 10, supra, stripped of its surplus verbiage and applied to a case of this kind, would read:

"The Corporation Commission is hereby vested with the power of a court of record to determine the amount of refund due where any public service corporation charges an amount for any service rendered in excess of the lawful rate in force at the time such charge was made or that may thereafter be declared to be the legal rate which should have been charged for such service rendered and to whom the overcharge should be paid."

Under this section, where a rate has been fixed and a public service corporation makes a charge for a service rendered that is in excess of the rate fixed, the Corporation Commission is vested with authority to compel a refund of such excess charge. If the Corporation Commission is not vested with authority to compel a refund until after a rate has been fixed, then that part of said section is meaningless which reads: "* * * Or may thereafter be declared to be the legal rate which should have been applied to the service rendered. * * *" That part of the section clearly contemplates a case of this kind. Where an arbitrary charge has been made by a public service corporation which has not

ᴜeen established by any authorized rate and application is made to the Corporation Commission to fix a rate and the arbitrary charge is in excess of the rate fixed by the Corporation Commission, it may compel reparation to be made by compelling the public service corporation to refund the excess charge and determine to whom the same should be paid. If this were not true, a public service corporation might make any exorbitant charge for a ' specific service rendered where no rate had been fixed. Application might be made to the Corporation Commission to fix a rate for such service, but it might require two or three months, or more, before the Corporation Commission could determine what would be a reasonable rate. During all of this time the public would be at the absolute mercy of the public service corporation. Under the common law they would have their right of relief by an action in a court of record, as has been said in the case of M., K. & T. Ry. Co. v. New Era Milling Co., 79 Kan. 435, 100 Pac. 273:

"1. Independent of any statute—as a part of its common-law obligation—a railroad company is required to treat its patrons impartially and to avoid unjust discrimination.

"2. Any discrimination in charges on the part of a common carrier is unjust for which no sufficient reason exists in the character of the service.

"3. The requirement that one shipper shall pay a higher rate than another for substantially similar services rendered under substantially similar conditions is an unjust discrimination, of which any one may complain who is thereby injured.

"4. A shipper has a right to demand that the rates charged him shall not only be reasonable in themselves, in respect to the profit to the carrier, but reasonable in respect to the charges made for similar services under similar circumstances to other shippers who are or who may be his business competitors.

"5. Where a tariff of a railroad company fixes a rate on shipments originating on its own line or on certain enumerated connecting lines, it assumes the obligation to carry at that rate for shippers whose shipments originate on other lines as well, and if such a shipper is required to pay for such services at a higher rate than that named in the tariff. hᴇ is entitled to recover the amount of the overcharge."

By section 1, chapter 10 supra, a statutory remedy has been provided. and the complainant, having invoked this remedy, is entitled to the relief asked for by way of reparation. It was the duty of the Corpora-

tion Commission to grant this relief and determine the amount of reparation due, if any, and from which public service corporations it was due and to whom the same should be paid.

Order No. 1813 of the Corporation Commission is hereby affirmed. This case is remanded to the Corporation Commission, with instructions to proceed under section 1, supra, and determine the amount of refund due, if any, for excess charges paid to any of the said railway companies under the complaint filed herein, and determine to whom the same should be paid, and grant to the complainant the relief it may be entitled to in the premises.

PITCHFORD, ıV. C. J., and JOHNSON, McNEILL. ELTING, KENNAMER, and NICHOLSON, JJ., concur.

### On Rehearing.

ELTING, J. A former opinion by this court was rendered in the above entitled cause on the 14th day of February, 1922, affirming order No. 1813 of the Corporation Commission and remanding the said cause to the Corporation Commission with instructions to proceed under section 1, chapter 10, Session Laws of 1913, to determine the amount of refund due, if any, for excess charges paid to the appellants herein, and to which opinion objections are filed in a petition for rehearing filed in this court alleging error in said decision in that it holds that the rates charged by appellants for the transportation of mine run and slack coal between September 1, 1920, and December 15, 1920 (the effective date of order No. 1813), were arbitrary rates fixed by the railroad company, and that therefore the Corporation Commission was authorized under section 1, chapter 10, Session Laws of 1913, to determine the amount of refund due on account of charges collected in excess of lawful rate, in force at the time of such charges.

It is contended by the appellants that the record does not disclose sufficient grounds upon which to base a holding of arbitrary charges by the appellants, and that the record fails to show discriminatory charges, and even if found discriminatory, that there is no evidence to sustain such a holding. that said charge was unreasonable.

It appears that the appellants' main contention was based upon two propositions: First, that section 23, article 9, of the Constitution provides as follows:

"That no order of the commission prescribing or altering such rates, charges, or clas-

sification, rules or regulations, shall be retroactive."

This provision of the Constitution, standing alone, would seem to prohibit the Legislature from giving authority to the Corporation Commission to order refunds, but section 35, article 9, of the Constitution provides as follows:

"That after the second Monday in January, 1909, the Legislature may, by law, from time to time, alter, amend, revise or repeal sections from 18 to 34, inclusive, of this article or any of them or any amendments thereof," etc.

Hence, there was no inhibition upon the Legislature to enact section 1, chapter 10, of the Laws of 1913. Said section is set out in the original opinion. Besides, section 18, article 9, of the Constitution gives to the Corporation Commission power to correct abuses and prevent unjust discriminations and extortions by transportation and transmission companies.

The latter part of section 8235, Rev. Laws 1910, declares the duties of such companies in rendering services to the public and such constitutional and statutory provisions are merely declaratory of the common law. These matters are discussed and considered in the original opinion.

The second proposition, contended by the appellants is what they call an effort to distinguish between lawful rates in force at the time the charges were made, and what they call legal rates to be thereafter declared and as set out in said section 1, chapter 10, Session Laws of 1913, and using this distinction, which the appellants contend is a distinction without a difference, as authority for declaring a refund.

The original opinion found that the record showed a discriminatory charge. It is true that a discriminatory charge must be found as a fact based upon the proofs. The record shows that it was a discriminatory charge and such a charge is an illegal, unwarranted, and arbitrary charge, and was so declared by the Corporation Commission in its order of December 15, 1920, and comes within the power of the commission granted by section 1, c. 10, Sess. Laws 1913, reading as follows:

"Or may thereafter be declared to be the legal rate which should have applied for service rendered."

It is just in such case that it is the purpose and intent of the Legislature in said act to give the Corporation Commission authority to determine the amount of refund that it should order to be repaid to the shipper.

The petition for rehearing is denied.

PITCHFORD, V. C. J., McNEILL, MILLER, and KENNAMER, JJ., concur.